I will now call the case of Robert Otto and others against the City of Boca Raton, Florida Good morning, Your Honors. I'm Matt Staver and my co-counsel is Horatio Mehet and Roger Gannon. May it please the Court, on behalf of the appellants, I respectfully request that this Court reverse the decision below because the ordinances violate the First Amendment. In this particular case, the ordinances clearly regulate the content of what counselors want to say to their clients who are informed, consent, and seek to set their own individual objectives. They regulate the particular content when that counsel involves a goal to change unwanted same-sex attractions, behavior, or identity conflicts. Even when the client seeks that, clients are like the driver of a car and counselors are like a GPS. They don't set the direction, they just take the direction from the driver. They don't dictate to the client any more than the GPS dictates how or where they should go when they enter in the car. They just try to reach the objective of the client. The clients set the goal and under standard counseling procedures across this country, the counselor is not supposed to override the self-autonomous determination of the client, but to help the client reach that goal. And when the client has a goal of change in Palm Beach County and Boca Raton, they cannot help that client. They must either remain silent or they must try to override that client's right of self-determination. Of course, this . . . Go ahead. Counsel, before you can proceed, I just had a question. The trial court, the district court judge did not rule on the preemption issue, correct? Correct. I didn't find a case on point, so is it your belief that the district court judge should have ruled on preemption first before deciding the rest of the case? Judge Lillo, that's exactly what the judge did in the Vazo case in the city of Tampa, had both the same preemption argument and the First Amendment, and ultimately ruled on the preemption to not address the constitutional issue. That was at summary judgment or at a preliminary injunction. There is a U.S. Supreme Court case called Ling. It's 485 U.S. 439 1988. That addresses whether the constitutional claim gives more relief than the underlying preemption claim. In this case, particularly at preliminary injunction, the constitutional claim of free speech does give a greater benefit or remedy to the plaintiffs, in this case the appellants, than does the preemption, particularly on the issue of irreparable harm. So we would ask the court to address the First Amendment issue, but since you raised the issue of preemption, I will also address that as well. I think the preemption case certainly is very clear, and I would recommend the Vazo decision on that issue. Again, that was at summary judgment, we're at preliminary injunction, and the First Amendment gives a broader legal right with regards to the presumption of unconstitutionality when there's a content-based restriction, and also on irreparable harm when speech is at issue, and we have both of those here. So I'd ask the court to address that, but on the preemption issue, the entire subject matter has been preempted by the state of Florida. There is no room for these counties to regulate. In fact, the council for the city and the counties already acknowledged that. When they were pressured by public interest organizations to adopt this ordinance, they issued opinions saying that this entire field has been preempted. There is no basis or ability for local governments to regulate health care. You know, in a past life, I represented the medical board in Georgia at the Attorney General's office where Judge Grant also served. Of course, these licensing boards often put limitations on ways in which patients can be treated. It's just, this is a whole messy area, and so, I mean, what would have been appropriate in the way of limitations in this area? Well, the comprehensive regulation in the state of Florida does not restrict what our counseling clients are able to say. So if they step across the county line in Palm Beach or outside the city of Boca Raton, they can do exactly what they did before these ordinances, so there's a clear conflict. There have been numerous attempts to pass this kind of same restriction on the state level, and the Florida legislature year after year after year, including last year, have rejected these attempts. I didn't see all this coming. I mean, there's so many permutations of things that doctors and their patients need to talk about, and so, you know, our job as a court, whether we want to do it or not, is to develop these categories. What is conduct, and what is speech? It does look like, to me, in fairness, in this case, that the city and the county made some efforts to narrow this, and so these doctors can refer minor children to other practitioners or religious leaders, and they can treat adults with this type of treatment. So, you know, it's not a complete ban, and I mean, why is it not conduct? Judge Martin, because NIFLA at the Supreme Court has already addressed that. In the NIFLA decision, it abrogated three cases, two of which are the original counseling ban cases. The pickup case out of the Ninth Circuit, which I argued, the King case out of the Third Circuit, which I also argued, and in both of those, although they looked at different standards of review, they ultimately upheld the bans because they said it involved professional speech. The King case clearly rejected the idea that it was not content-based, found that it was content-based, but notwithstanding said that it was professional speech. NIFLA abrogated, by name, pickup and King, and also more King out of the Fourth Circuit, didn't deal with this specific situation, but it dealt with regulations of what a fortune teller could say. That was also abrogated. What King, what NIFLA also did is affirm and recognize this court's en banc decision in Woschlager, and in Woschlager, this court clearly had issues constitutionally in the First Amendment. That was a much broader application. I mean, no doctor in Florida was allowed to ask any patient of any age about whether there was a gun in the house under that legislation. And no doctor, counselor, psychiatrist in Palm Beach or Boca Raton can provide any counsel whatsoever with the goal of change. Well, they could say, would you like this type of treatment? No, they wouldn't be able to do that. How, if they did that, would you like this kind of treatment? And they say, yes, that's what I want, that's why I came here. What do they do? They, you're asking me? Yeah, I mean, the point is they can't counsel them. Isn't that prohibited under both ordinances? Yes, absolutely. In fact, one of the ordinances even has more of a viewpoint, well, they both have the same thing, they're just difference in fines. They say that you can't even counsel someone regarding romantic attractions or romantic affections towards someone of the same sex or gender. Let me ask you a question, and I'm going to ask this to Mr. Geddes as well on the other side. My understanding when I read the ordinance is if you have someone who identifies as they were born a biological male, they come in and now they're identifying as a female. During the discussion, the therapist, is the therapist even allowed to ask, why do you believe now that you are a female? Is that allowed? They might be able to ask, but if that particular person now identifies as a female but biologically male, says, I don't want to identify as female, I want to go identify as male. That's what I understand. So if he says, if the minor at that point says, I identify as a female because I have an attraction to boys. At that point, the therapist, the way I read it, cannot say, perhaps you just have a same sex attraction. That's correct. Cannot help that client, even when the client expressly through informed consent. In Chapter 766 of the Florida Statutes, it's clear on the right of informed consent. Article 1, Section 23 in the Florida Constitution, the right of privacy, including medical treatment, and the right to set autonomous decisions, both from a health care provider, including counselors and clients, to be able to set your goal. That's established throughout Florida statutes. But in this case, there's one area in Palm Beach or Boca Raton that that doesn't apply. And that is in that exact situation, Judge Lacoa, that comes up. In fact, their 30B6 witness actually has a colloquy that we cited into the briefs. And it is that very question. Somebody who's born, say, male, now wants to identify as female, but then doesn't feel comfortable as that, wants to really identify as male. If that counselor tries to help that person identify consistent with their birth sex, that's banned. And they say, specifically, you cannot do that anywhere in Palm Beach County. The county and the city have put forth some evidence that this type of therapy could be harmful to children. Obviously, you don't think that that evidence is sufficient. If we were looking for enough evidence to satisfy strict scrutiny, what do you think would be required? More than conjectural harm under McCullen. And in this particular situation, they haven't put forth any evidence. They've got the American Psychological Association Task Force. And then they've got policy statements, not research. The APA, which they actually cited, including the district judge below, actually cites that there is a dearth of research and that you shouldn't prohibit this kind of counseling, that you should respect both the minor and the parents and provide informed consent. There is no ban in the APA task force, which is all they have, to change counsel. There is no studies on harm with regards to minors regarding change counsel. And there's zero evidence, and they didn't rebut this, regarding gender identity. Nothing in any of the statements. Nothing in the APA task force. And when we raised it in our brief, they did not rebut that. They have zero evidence. You need much more than that when you're restricting free speech. These particular ordinances should be analyzed under READ, because based on the face of the ordinance and also in their application, the only way you determine whether or not there's a violation is to listen to what the counselor is saying. And when that counselor ultimately engages in a conversation, which they agree, they do this 100% through words, just like a GPS. They're not coercing someone. They're just providing words. When that counselor ultimately is deemed to help that client reach a goal of change, these ordinances kick in. It is clearly a content speech regulation, and it's subject to strict scrutiny. They have no compelling interest. And by the way, not only the lower court, but neither the city or the county even tried to show that this was narrowly tailored. Clearly, it is not narrowly tailored. I see that I'm out of time, and I'll save the rest of my time for rebuttal. Thank you. Good morning, Your Honors. May it please the Court, my name is Dan Abbott, and along with Ed Geddes from the law firm of Weiss, Sirota, and Helfman, we represent the city of Boca Raton. Your Honors, the ordinance that is under attack here is an ordinance that prevents what is found to be a dangerous and ineffective medical procedure. It is a regulation of conduct and not a regulation of speech. There is not a single phrase or word that the ordinance prohibits these psychologists or anyone else from uttering. It is a regulation of conduct. Doesn't the NIFLA case present a pretty serious problem for your argument in that respect? No, Your Honor, I don't think it does. I think the NIFLA case is completely supportive of the city's position. The NIFLA case says things like the following. NIFLA said there is not a separate category of professional speech. We have never defended the ordinance as being a regulation of professional speech. The basis for the ordinance is it doesn't regulate speech at all. It regulates conduct in exactly the sort of way that NIFLA says that we can't. But how does it regulate conduct when it's undisputed that the therapy in question is completely talk therapy? Well, because sometimes talk is the conduct, and the courts have made that completely clear, and NIFLA has made that clear. NIFLA has said while drawing the line between speech and conduct can be difficult, this court's precedents have long drawn it. And what it means by that is sometimes the speech is- Where are you reading from that? From NIFLA, Your Honor. From the dissent, from the concurrence? No, Your Honor, from the opinion. In the NIFLA opinion, it rejects the concept that there is a separate category of speech called professional speech. And it says that there are two categories of speech that are really regulatable and not protected speech. And one is when speech is conduct, as is the case here. Let me ask you a question regarding your client's ordinance, which is BOCA, correct? Yes, Your Honor. All right. Well, when you read the ordinance, it talks about efforts to change behaviors. So let me go back to the hypothetical that I posed to opposing counsel. If you have a client who comes in to a therapist, born biologically a male, now identifies as a female. And during the therapy, it comes up that the reason that they identify as a female now is because they have a same-sex attraction to males. Can that therapist then have a discussion with them? Because now they identify as a female. Can they have a discussion and say, perhaps you have a same-sex attraction to males and you're homosexual as opposed to a woman? Of course, Your Honor. Can you explain that to me how? Because my understanding of the ordinance, and I read all the deposition transcripts, and the people who talked about it from BOCA said that that, in fact, was not permitted under the ordinance. No, Your Honor. I don't know the particular question that you're – the particular quote from the representative that you're asking. But a review of the ordinance makes the following crystal clear. That psychologist can say anything he or she wants to that patient. He can say, I think this is the reason that you're feeling the way that you're feeling. I think he could say, I think that you should stop being homosexual or that you should stop identifying as a particular gender. He can say, I think that you should probably go get treatment. Sexual orientation change efforts because I think that they're effective. I think they work. I think you should go to a religious leader or to somewhere outside of the BOCA Raton, and here is the number of a doctor that can do those things for you. Each and every one of those things is absolutely permissible under the ordinance. If this therapy is harmful, as your city asserts, then why wouldn't the ordinance also need to exclude others from giving this kind of therapy? Perhaps there would be a different carve-out for religious leaders for other reasons, but how could you realistically limit it to therapists if the basis is that this is harmful in the first place? A couple of reasons, Your Honor. First of all, as your appellants criticize, regulations like this should be supported by the evidence. The evidence that the city has are statements or conclusions from nine major mental health psychological organizations. In fact, your amicus suggests that there are five other mental health psychological organizations that have recommended against this sort of psychological therapy. That's the factual basis for the ordinance, and extending that to other speakers would not have a basis. The reason might be obvious, Your Honor, which is the following. While these psychologists try to minimize what they do, in other words, to suggest that they are indistinguishable from people that simply put a soapbox on a street corner and speak, that's not what psychologists are. Psychologists are trained professionals that learn methods and methodologies to change behavior. They are the people who the studies suggest have been doing things that are ineffective and that are causing harm, and that's why that's the sort of conduct that the city has banned. The other reason, and Your Honor has pointed this out, when there is a criticism that why don't you ban religious leaders from doing it, not only is there not an evidentiary basis for the city to have done it, but there were other constitutional issues that had not been resolved at the time the city adopted the ordinance. If this ordinance can stand, then could a community with different values who found different assertions from professional groups actually ban counseling intended to assist a person, say, going through a gender transition, or intended to help a person explore their same-sex attractions? If that city said, well, we have these studies that say that that type of counseling is harmful? Well, I think the short answer is today, I don't think they could, because those sorts of studies don't exist. But of course, any time, if a government develops a sufficient evidentiary basis, if the quantum of evidence for those sorts of counseling, as you suggested, came to be, if the scientific community has come to learn that certain kinds of counseling that are provided to people who are undergoing gender transition are both ineffective and substantially harmful, these studies are talking about 60% suicide rates, etc., then of course a government can end a practice that they have found to be harmful. So we could have a patchwork of different counseling approaches across the country based on whichever communities thought that a particular practice was more or less harmful. That seems in serious tension with the First Amendment. Well, it's not in tension with the First Amendment if, again, we're not regulating speech at all. We are regulating a procedure. Really, when some states ban certain medical procedures and other states do not, I suppose you could say that's a patchwork. This court has said that characterizing speech as conduct is a dubious constitutional enterprise. How can we get from point A, which is this is purely literally speech, to this speech constitutes conduct but other speech constitutes speech? Well, the quote that Your Honor has read me is from Walschlager. This issue wasn't at issue in Walschlager, but that sentence standing alone that speech is not conduct, calling speech conduct is a dubious constitutional enterprise, respectfully if it is thought to be. Counsel, it was to some degree at issue because that particular sentence that Judge Grant read from was addressing pickup, which is actually on point. I understand, and in addressing pickup, here's what the court had to say about pickup. It said the pickup law importantly, and I'm not adding that word. So in discussing pickup, remember Walschlager was not a sexual orientation change efforts case. It says pickup importantly did not restrict what the petitioner could say or recommend to a patient or client, which is exactly the same as the case here. We also said that we had serious doubts about whether pickup was correctly decided. What has happened since then that would interfere with the serious doubts that 11 out of 12, I believe, members of the court had? Well, at the very least, NIFLA happened. And forgive me, Your Honor, I didn't answer your earlier question. But if one pulls that sentence in Walschlager out of context, as the law in this circuit, which is we do not distinguish speech is never conduct, it's a dubious enterprise, the statement is simply wrong, and that's what the NIFLA court, that's what the Supreme Court said after Walschlager. It said while it's sometimes difficult, sometimes words are not speech. Sometimes words are the conduct. And if that's ever the case, this is the case because the words are the activity. Let me ask you, let me make this final point. I see I'm running out of time. If what these counselors say is correct, that all they do is speak, and so they are entitled to a full category of constitutional protections because they are speakers, under what authority does the state of Florida license psychologists? Wouldn't it all be prior restraint because they are just speakers? And the answer is that they're not just speakers. They are medical practitioners, and the way they practice their profession is regulatable, and I see my red light. I have a question, actually, Mr. Abbott. I assume it's your position that the city considered less restrictive means. Do you say the city did that? Well, the less restrictive means that the counselor suggested, why didn't you just ban aversive therapy and why didn't you just ban therapy, non-consensual therapy? And the answer is if the city thought about that, it rejected it immediately because the studies on which it's based, and this is described in detail in the brief, suggests that those things are harmful. Speech therapy is harmful, not just aversive therapy, and consensual therapy of minors causes harm. I want to make sure I'm understanding what you're saying. Are you saying if the city considered and rejected those alternatives, it would have been for that reason? Or you're saying the city did consider and reject those alternatives for those reasons? Well, Judge, here's the background. A draft ordinance was presented to the city council, and that draft ordinance was adopted. So I don't want to extend beyond the record and suggest what was going through elected officials' minds. Did they think of doing something less? My only point is the record fully supports that there is no less restrictive alternative because the things that are being alleged, things that they suggest should be kept out of the ordinance are activities that have been expressly found to be harmful in the studies that are the basis for the city's regulation. Thank you. Thank you. Good morning. Good morning. May it please the court. My name is Helene Vizd with the Palm Beach County Attorney's Office, and I represent Palm Beach County in this matter. We certainly adopt the arguments made by counsel for Boca Raton, but I'd like to address two quick points, if I may. It was suggested during the appellant's argument that, in fact, there is no scientific evidence establishing a harm as to conversion therapy. In the Vazzo case, which has now been partially briefed, this court has the brief of Amici and also the initial brief. The Equality Florida brief plainly presents to this court additional testimony, additional evidence beyond all of the scientific evidence we already have. The Caitlin Ryan study establishes that of those young individuals who were subjected to conversion therapy as minors, over 60% reported attempting suicide. There is plenty of evidence in front of this court. There is plenty of medical evidence establishing the harm of conversion therapy. Appellants also suggested that, in fact, the record will show that counsel or opinions of counsel, in fact, as Judge LaGoya mentioned, recommended that preemption should prevent the county or the city from passing the ordinance they passed. I can speak to that matter. It was my legal opinion. In fact, I explained during the six-hour deposition that I gave that my opinion in August of 2016 was that, in fact, the county was preempted by the state, but that my opinion changed based on additional research and additional evidence, most specifically a memorandum of law presented by the Wellington Village attorney in which she noted the language of section 456.003 of the Florida statutes. That is the section that deals with regulation of health professionals. And that statute provides quite plainly, the legislature further believes that such professions shall be regulated only for the preservation of the health, safety, and welfare of the public under the police powers of the state. Such professions shall be regulated when, and I'm reading now from 456.0032B, the public is not effectively protected by other means, including but not limited to other state statutes, local ordinances, and federal legislation. Do you think we have enough information at this stage of the case to decide the preemption issue, or is that something more appropriately decided at the summary judgment phase? Your Honor, this is a very interesting question given the status of us being here before the VASO case is here. The VASO case is only partially briefed at this point. I think certainly this court can take notice of other cases in front of it. The VASO was summary judgment stage, correct? That was at the summary judgment stage, yes, exactly. And in fact, preemption did not become a major focus of our case in front of the trial court. It was simply raised by a question from you, Judge Nagoya. I just asked a question as to whether or not it was something almost like a sovereign immunity. I understand it's not sovereign immunity, but there is a case law that suggests sovereign immunity should be decided first before anything else in the case in terms of the merits of the case. And it was a brief portion of the order that is in front of this court in this case because the trial court did determine as to an injunction that there was no irreparable harm established as to the claim that in fact the county was preempted from enacting the ordinance that it enacted. It's clear that many people have strong views on this type of discussion. What do you make of the APA report statement that given the lack of empirical evidence from randomized controlled trials of the efficacy of treatment aimed at eliminating gender discordance, the potential risks of treatment and longitudinal evidence that gender discordance persists only in a small minority of untreated cases arising in childhood, further research is needed, and so on and so forth. Is the evidence as strong data-wise as you might want it to be to support a speech restriction? It absolutely is, Your Honor. And what you're quoting from is just a very brief portion of a very large APA task force report. And in fact, that section that you quoted references further study is necessary. The Caitlin Ryan study is further study, and it's there, it's present, and it shows a real harm from the dangers of conversion therapy. Palm Beach County requests this court respectfully affirm the trial court's order below. I want to ask you the same question I asked your colleague from the city. I assume it's your position that the county did consider less restrictive alternatives, and if so, where is that in the record and how long did it take? Yes, Your Honor. Excuse me. Yes, Your Honor. It's in the record of the two lengthy hearings that were held in front of the Palm Beach County Board of County Commissioners. And in fact, numerous people spoke at both of those hearings, which lasted several hours each. In fact, the county identified six providers within Incorporated Palm Beach County who were providing conversion therapy. A mental health professional stood up, addressed the Board of County Commissioners, and suggested that conversion therapy not only violates the ethics of the profession, but it also implies that a therapist has the ability to change one's sexual orientation. Several people who were opposed to the conversion therapy ban spoke, many of them suggesting that aversion therapy should be the therapy that was avoided. In fact, the BCC considered that testimony, considered those statements by those individuals in front of the BCC. So if you just take a look at the two very lengthy transcripts. Some of those individuals were therapists, correct? Correct. Who opposed the ordinance. Exactly. Yes, Your Honor. Both sides presented their case to the Board of County Commissioners for Palm Beach County in lengthy hearings. So those issues were considered. Thank you. Thank you. May it please the court. Ryan's study is not in this record. Even if it is, it wouldn't support their claim. It concludes that there is, like the others, no causal connection. I would refer also, this court, to pages 27 and 28 in which the 30B6 witness for the defendant said they spent about five minutes looking at narrow tailoring or alternative options. In fact, they didn't spend any arguments on what those narrow tailoring options would be. Neither did the lower court. Indeed, informed consent would be a particular option. And that's exactly what the APA task force recommends, that the clients be fully informed, including the minors and the parents. And they make an informed decision, and then you leave it up to the judgment of the counselor to ultimately counsel. What would be your less restrictive alternative, if I could force you to give me one? Well, I think, clearly, informed consent. And it's already there. They already do the informed consent. And it's already under 766 of the Florida statutes. And Florida statutes regarding patients' rights and alternative health care have a broad right of clients to be able to set the directive and choose the health care provider of their choice, including the health care provider. There is no equivalent regulation at all in counseling or elsewhere regarding what can be said. Isn't that complicated by the fact that these are minors, and they can't really give informed consent? No, Your Honor, because minors give informed consent through their parents. And as the indication in this record shows, if a parent wants to have a child in one direction, but the child's not willing to go, these counselors are not going to force that client to go in a direction that the client doesn't want to go. The client is that child, not the mom or the dad. And the reason is, is because of the overwhelming idea within counseling, is that the person has the right of self-determination. And you can't lead a horse, you might be able to lead them to water perhaps, but you can't make them drink. And you can't have successful counseling if the client, the minor, is unwilling to go in a certain direction. There is no coercion. What about some of the more physically perhaps harmful therapies that various people have advocated for or more often against in this arena? Would your argument that this speech is speech extend to those types of therapies, or would those types be more obviously conduct? Those are more obviously outside of the pure words. And as they have stipulated, clearly what happens in these counseling sessions are only words. There is no such thing, frankly, within the counseling world of conversion therapy. And in fact, the old outdated motives that they say in terms of aversion and other kinds of things, they haven't been practiced in decades. Let me just close with Woshlager. Judges Pryor and Hall have a hypothetical. And NIFLA cites the prior concurrence with approval. And in that particular concurrence, the question is asked after a series of questions, quote, could a state prohibit a doctor from advising a client about sex reassignment surgery? And the unequivocal answer that was being expected is absolutely no. And that's exactly what these ordinances have sought to do. They are unconstitutional, content-based regulations. They don't survive strict scrutiny. And thank you very much, Your Honors. We request that you reverse and enter the preliminary injunction. Thank you. We're going to take a short break and we'll be back.